# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| PARAGON OFFSHORE PLC, | Case No. 16-10386 (CSS) |
| *Debtor.* | Adv. Pro. No. 17-51882 (CSS) |
| NOBLE CORPORATION PLC, NOBLE CORPORATION HOLDINGS LTD, NOBLE CORPORATION, NOBLE HOLDING INTERNATIONAL (LUXEMBOURG) S.à r.l., NOBLE HOLDING INTERNATIONAL (LUXEMBOURG NHIL) S.à r.l., NOBLE FDR HOLDINGS LIMITED, MICHAEL A. CAWLEY, JULIE H. EDWARDS, GORDON T. HALL, JON A. MARSHALL, JAMES A. MACLENNAN, MARY P. RICCIARDELLO, JULIE J. ROBERTSON, and DAVID WILLIAMS, | C.A. No. 18-cv-1277 (LPS) BAP No. 18-43 C.A. No. 18-cv-1345 (LPS) BAP No. 18-45 |
| *Appellants and Cross-Appellees,* | |
| v. | |
| PARAGON LITIGATION TRUST, | |
| *Appellee and Cross-Appellant.* | |

## OPENING BRIEF OF APPELLEE AND CROSS-APPELLANT
## <u>PARAGON LITIGATION TRUST</u>

JONES DAY
Bruce Bennett
James O. Johnston
555 South Flower Street
Los Angeles, CA 90071-2300
Telephone: (213) 489-3939

JONES DAY
Gregory M. Shumaker
David S. Torborg
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939

YOUNG CONAWAY
STARGATT & TAYLOR, LLP
Pauline K. Morgan (No. 3650)
Michael Neiburg (No. 5275)
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600

*Counsel for Appellee and Cross-Appellant Paragon Litigation Trust*

October 10, 2018

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 8012 of the Federal Rules of Bankruptcy Procedure, Appellee and Cross-Appellant Paragon Litigation Trust (the "<u>Trust</u>") states that it is a liquidating trust created pursuant to the *Fifth Joint Chapter 11 Plan Of Paragon Offshore plc And Its Affiliated Debtors*, as confirmed by order of the Bankruptcy Court entered on June 7, 2017 (the "<u>Plan</u>"), for the purpose of prosecuting the "Noble Claims" (as defined in the Plan) and distributing the proceeds thereof in accordance with the Plan and the Litigation Trust Agreement approved by the Plan, with no objective to continue or engage in the conduct of a trade or business. The Trust is not a publicly held corporation.

<h1 style="text-align:center">TABLE OF CONTENTS</h1>

I.     **PRELIMINARY STATEMENT** ...........................................................................1

II.     **JURISDICTION** ....................................................................................................3

III.     **STATEMENT OF ISSUES AND APPLICABLE STANDARDS OF REVIEW** .........4

IV.     **STATEMENT OF THE CASE** ...............................................................................6

    A.     **Noble Loots Paragon** ............................................................................6

        1.     The Prelude:  Noble Searches For Ways To Dump Failing Assets ............6

        2.     The Motive:  The Standard Spec Business Deteriorates............................8

        3.     The Method:  Noble Deceives The Market And Houlihan........................9

        4.     The Deed:  Noble Absconds With $1.7 Billion .......................................11

        5.     The Aftermath:  Bankruptcy ...................................................................11

    B.     **The Timeline:  All Relevant Conduct Occurred Before The Master Separation Agreement** ............................................................................13

    C.     **The Bankruptcy Case And Ruling Below** .........................................15

V.     **SUMMARY OF ARGUMENT** ...............................................................................18

VI.     **ARGUMENT** .......................................................................................................19

    A.     **The Bankruptcy Court Did Not Clearly Err In Finding That The Individual Appellants May Not Enforce The Arbitration Provision** .................................19

        1.     Paragon Never Agreed To Arbitrate With Non-Signatories.....................20

        2.     The Individual Appellants Cannot Enforce Rights Of The Parties To The Separation Agreement...........................................................................23

        3.     The Trust's Claims Are Not Within The Scope Of The Arbitration Provision .............................................................................................26

        4.     The Plan Precludes Arbitration ...............................................................30

    B.     **The Bankruptcy Court Did Not Abuse Its Discretion In Denying A Stay Of Litigation** ...............................................................................................32

    C.     **The Bankruptcy Court Erred In Holding That An Arbitrator Must Decide Whether The Unjust Enrichment Claim Is Subject To Arbitration** ...............37

VII.     **CONCLUSION** ...................................................................................................42

i

<span style="font-variant: small-caps">CASES</span>

*American Shipping Line, Inc. v. Massan Shipping Industries, Inc.*,
    885 F. Supp. 499 (S.D.N.Y. 1995)..................................................................35

*CardioNet, Inc. v. Cigna Health Corp.*,
    751 F.3d 165 (3d Cir. 2014)...............................................................29, 37

*Carlyle Inv. Management LLC v. Moonmouth Co.*,
    779 F.3d 214 (3d Cir. 2015)..................................................................19

*Century Indem. Co. v. Certain Underwriters at Lloyd's London*,
    584 F.3d 513 (3d Cir. 2009)...................................................................6

*Chesapeake Appalachia, LLC v. Scout Petroleum*,
    809 F.3d 746 (3d Cir. 2016)..................................................................39

*Choctaw Generation L.P. v. American Home Assurance Co.*,
    271 F.3d 403 (2d Cir. 2001)..................................................................25

*Contec Corp. v. Remote Solution Co.*,
    398 F.3d 205 (2d Cir. 2005)..................................................................26

*CTF Hotel Holdings, Inc. v. Marriott Intern., Inc.*,
    381 F.3d 131 (3d Cir. 2004)...................................................................4

*Degraw Constr. Grp. v. McGowan Builders, Inc.*,
    152 A.D.3d 567 (N.Y. App. Div. 2017) ..............................................24

*Douglas v. Regions Bank*,
    757 F.3d 460 (5th Cir. 2014) ..............................................................40

*Ernst & Young LLP v. Baker O'Neal Holdings, Inc.*,
    304 F.3d 753 (7th Cir. 2002) ..........................................................30, 31

*EXDS, Inc. v. Ernst & Young LLP (In re EXDS, Inc.)*,
    316 B.R. 817 (Bankr. D. Del. 2004) ...............................................35, 36

*F.D. Imp. & Exp. Corp. v. M/V REEFER SUN*,
    248 F. Supp. 2d 240 (S.D.N.Y. 2002)..................................................34

*FBI Wind Down, Inc. v. Heritage Home Group, LLC (In re FBI Wind Down, Inc.)*,
No. 17-2315, 2018 WL 3602932 (3d Cir. July 27, 2018)........................................41

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995)..........................................................................................37

*Ford v. NYLCare Health Plans of Gulf Coast, Inc.*,
141 F.3d 243 (5th Cir. 1998) ........................................................................29, 41

*Freeman v. Complex Computing Co.*,
119 F.3d 1044 (2d Cir. 1997)..............................................................................4

*Gerszberg v. Li & Fung (Trading) Ltd.*,
215 F. Supp. 3d 282 (S.D.N.Y. 2016)................................................................26

*Griswold v. Coventry First LLC*,
762 F.3d 264 (3d Cir. 2014)..............................................................................27

*Highland HC, LLC v. Scott*,
978 N.Y.S.2d 302 (N.Y. App. Div. 2014) ....................................................24, 25

*Hirschfeld Prods. v. Mirvish*,
88 N.Y.2d 1054 (N.Y. 1996) ............................................................................24

*In re All American Semiconductor, Inc.*,
No. 07-12963-BKC-LMI, 2010 WL 2854153 (Bankr. S.D. Fla. July 20, 2010),
*aff'd*, No. 10-23406-CV, 2011 WL 3843943 (S.D. Fla. Aug. 29, 2011)....................22, 31, 40

*In re CIT Grp., Inc.*,
No. 09-16565 (ALG), 2012 WL 831095 (Bankr. S.D.N.Y. Mar. 9, 2012) ............32

*In re G-I Holdings, Inc.*,
755 F.3d 195 (3d Cir. 2014)..............................................................................32

*In re Gandy*,
299 F.3d 489 (5th Cir. 2002) ............................................................................34

*In re GWI, Inc.*,
269 B.R. 114 (Bankr. D. Del. 2001) ..................................................................32

*In re Hagerstown Fiber Ltd. P'ship*,
277 B.R. 181, 208 (Bankr. S.D.N.Y. 2002)........................................................36

*In re Kaiser Group Intern., Inc.*,
   307 B.R. 449 (D. Del. 2004)........................................................................5

*In re Latimer*,
   489 B.R. 844 (Bankr. N.D. Ala. 2013) ......................................................34

*In re S.W. Bach & Co.*,
   425 B.R. 78 (Bankr. S.D.N.Y. 2010).........................................................34

*In re Shenango Grp.*,
   501 F.3d 338 (3d Cir. 2007)........................................................................5

*Intellectual Ventures I LLC v. AT&T Mobility LLC*,
   No. 13-1668-LPS, 2016 WL 6542857 (D. Del. Oct. 24, 2016).................34

*Ishimaru v. Fung*,
   No. Civ. A 929, 2005 WL 2899680 (Del. Ch. Oct. 26, 2005)...................25

*Jones Lang Lasalle Americas Inc. v. Int'l Bhd. of Elec. Workers Local Union*,
   C.A. No. 16-190, 2017 WL 6417631 (D. Del. Dec. 15, 2017)...................40

*Judd Burstein, P.C. v. Long*,
   180 F. Supp. 3d 308 (S.D.N.Y. 2016)........................................................20

*Lapina v. Men Women N.Y. Model Mgmt.*,
   86 F. Supp. 3d 277 (S.D.N.Y. 2015)..........................................................25

*Lepera v. ITT Corp.*,
   No. 97-1461, 1997 WL 535165 (E.D. Pa. Aug, 12, 1997) ........................35

*Lipscomb v. Clairvest Equity Partners L.P. (In re LMI Legacy Holdings, Inc.)*,
   553 B.R. 235 (Bankr. D. Del. 2016) ..........................................................17

*Lukens Steel Co. v. United Steelworkers of America*,
   989 F.2d 668 (3d Cir. 1993)........................................................................5

*National Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*,
   898 F.3d 243 (2d Cir. 2018)......................................................................22

*Opalinski v. Robert Half Int'l. Inc.*,
   761 F.3d 326 (3d Cir. 2014)......................................................................37

*Palcko v. Airborne Express, Inc.*,
   372 F.3d 588 (3d Cir. 2004).........................................................................4

*Parfi Holding AB v. Mirror Image Internet, Inc.*,
817 A.2d 149 (Del. 2002) ........................................................................29

*Pipia v. Rauscher Pierce Refsnes, Inc.*,
714 F. Supp. 501 (D. Kan. 1989) ............................................................33

*Puleo v. Chase Bank USA, N.A.*,
605 F.3d 172 (3d Cir. 2010).....................................................................37

*Qualcomm Inc. v. Nokia Corp.*,
466 F.3d 1366 (Fed. Cir. 2006)................................................................40

*Quilloin v. Tenet HealthSystem Philadelphia, Inc.*,
673 F.3d 221 (3d Cir. 2012).....................................................................37

*Richardson v. Coverall N. Am.*
C.A. No. 18-532 (MAS)(TJB), 2018 WL 4639225, at *4 (D.N.J. Sept. 27,
2018) .........................................................................................................38

*Ross v. American Express Co.*,
547 F.3d 137 (2d Cir. 2008)........................................................................4

*Smith/Enron Cogeneration L.P. v. Smith Cogeneration Int'l*,
198 F.3d 88 (2d Cir. 1999)........................................................................25

*Stechler v. Sidley, Austin Brown & Wood, L.L.P.*,
382 F. Supp. 2d 580 (S.D.N.Y. 2005)......................................................30

*Telecom Italia, SpA v. Wholesale Telecom Corp.*,
248 F.3d 1109 (11th Cir. 2001) ...............................................................29

*Turi v. Main Street Adoption Services, LLP*,
633 F.3d 496 (6th Cir. 2011) ...................................................................40

*Waldron v. Goddess*,
461 N.E.2d 273 (N.Y. 1984)....................................................................20

STATUTES

9 U.S.C. § 16(a) .................................................................................................4

11 U.S.C. § 544(b) and § 548 ..........................................................................17

28 U.S.C. § 157 and 1334..................................................................................3

## OTHER AUTHORITIES

Federal Rules of Bankruptcy Procedure Rule 8014(a)(4)(A) ............................................................3

Federal Rules of Bankruptcy Procedure Rules 8015(a)(7)(C) and 8016(d)(3) ............................44

Federal Rules of Bankruptcy Procedure Rule 8016(d)(2)(B) ......................................................44

Federal Rules of Bankruptcy Procedure Rule 8016(d)(2)(D) ......................................................44

*Fifth Joint Chapter 11 Plan of Paragon Offshore plc and its Affiliated Debtors*,
    Article XI ...............................................................................................................................3

# I.    PRELIMINARY STATEMENT

This appeal relates to litigation arising from a disastrous corporate "spin-off" by which appellant Noble Corporation foisted a fleet of old offshore drilling rigs on a captive group of subsidiaries it called Paragon Offshore, loaded up Paragon with $1.7 billion in debt, and transferred the loan proceeds to itself. Paragon was in bankruptcy eighteen months later, and creditors who had been duped into the financing were left holding an empty bag, ultimately receiving cents on the dollar in the bankruptcy case.

The Paragon Litigation Trust, appellee and cross-appellant here, brought an action in the Bankruptcy Court for the benefit of those creditors and their successors. The Trust's suit is, first and foremost, an action to avoid and recover $1.7 billion in fraudulent transfers that Noble extracted from Paragon. The first five counts of the Trust's eight-count complaint seek that relief. The appellants agree that those fraudulent transfer claims are not subject to arbitration and will be litigated in the Bankruptcy Court. Br. at 17 n.6.[1]

The Trust also brought three claims for damages resulting from the misconduct of Noble, Noble's corporate affiliates, and various individual insiders who orchestrated the spin-off. In the dispute now on appeal, the appellants asked the Bankruptcy Court to dismiss those claims due to an arbitration clause in a "Master Separation Agreement" ("Separation Agreement") between Noble and Paragon and to stay litigation of the Trust's fraudulent conveyance claims pending arbitration.

The Bankruptcy Court denied arbitration as to the two counts against the individual appellants, concluding that the individuals cannot enforce a contract to which they are not parties

---

[1]    "Br." is the Appellants' Opening Brief [D.I. 6]. "Op." is the Bankruptcy Court's Opinion [D.I. 1-1]. Docket items in the adversary proceeding below are cited as "Adv. D.I." and docket items in the main bankruptcy case are cited as "Bk. D.I."

and from which they are expressly excluded.  The court demurred with respect to the Trust's final claim (unjust enrichment), concluding that the corporate appellants – as express beneficiaries of the contract – may ask an arbitrator to determine whether the claim is subject to arbitration.  The Court also denied the requested stay, noting that "the very heart of the Complaint stems from the fraudulent conveyance" claims that are not subject to arbitration.  Op. at 43.

The Bankruptcy Court's decision is almost entirely correct.  The court did not clearly err in finding that the Separation Agreement does not provide for arbitration of the Trust's claims against the individual appellants.  The Separation Agreement expressly excludes the individuals as beneficiaries of the agreement, including its arbitration provision, and "there is no 'evidence which affirmatively establishes that the parties expressly agreed'" to arbitrate disputes with non-signatories like the individual appellants.  *Id*. at 31.  Moreover, the Trust's claims against the individuals in no way arise out of, depend upon, or intertwine with the Separation Agreement.  There is no connection between the rights and obligations created by the Separation Agreement – which addressed the go-forward administrative details associated with the cleavage of two businesses – and the substance of the Trust's claims.  Indeed, the Separation Agreement includes no provisions concerning what Paragon would pay for the transferred assets.  The Trust's claims could and would have been brought even if the Separation Agreement had not been executed.

Similarly, the Bankruptcy Court did not abuse its discretion in denying a stay of the Trust's fraudulent conveyance claims.  Those claims clearly predominate the ancillary damage claims for which the appellants sought arbitration.  Even if all three of the damage claims were sent to arbitration, the arbitration would not moot or limit the fraudulent transfer litigation before the Bankruptcy Court, and the appellants suffer no prejudice in the absence of a stay because

they are subject to discovery on the fraudulent transfer claims – which, again, appellants agree are not arbitrable – in any event. There is no reason to further delay these proceedings in deference to an arbitration proceeding that even now – two months since the Bankruptcy Court's opinion – has yet to be initiated.

The Bankruptcy Court, however, did err in concluding that an arbitrator should decide whether the unjust enrichment claim is subject to arbitration. The Separation Agreement does not expressly or exclusively delegate the question of arbitrability of claims to the arbitrator. And any delegation would be limited to issues relating to interpretation or construction of the agreement. Moreover, like the other damage claims, the unjust enrichment claim has nothing to do with the Separation Agreement, which was executed weeks *after* assets were transferred, lenders parted with $1.7 billion, and Noble usurped the loan proceeds for itself. The Trust could and would have brought the claim even if the Separation Agreement had not been executed.

Accordingly, the Trust requests that the Court affirm the Bankruptcy Court's Order denying arbitration of the Trust's claims against the individual appellants and denying a stay of litigation (Case No. 18-1277), but reverse with respect to the Order's determination that an arbitrator must decide arbitrability of the Trust's unjust enrichment claim against the corporate appellants (Case No. 18-1345).

## II.    JURISDICTION

The Bankruptcy Court had jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 and Article XI of the *Fifth Joint Chapter 11 Plan of Paragon Offshore plc and its Affiliated Debtors*. Bk. D.I. 1614-1 (the "Plan").[2]

---

[2]    The Trust makes this statement for the appellants, who failed to provide it as required by Rule 8014(a)(4)(A) of the Federal Rules of Bankruptcy Procedure.

The Court has jurisdiction over the appeal pursuant to 9 U.S.C. § 16(a)(1). The Court has pendent jurisdiction over the Trust's cross-appeal because it relates to and arises out of the same facts and legal issues as the appeal. *See, e.g.*, *CTF Hotel Holdings, Inc. v. Marriott Intern., Inc.*, 381 F.3d 131, 135-36 (3d Cir. 2004) (exercising pendent jurisdiction over cross-appeal of stay pending arbitration); *Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 594-95 (3d Cir. 2004) (exercising pendent jurisdiction over state law issues where jurisdiction of main appeal premised on 9 U.S.C. § 16(a)); *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1049-50 (2d Cir. 1997) (exercising pendent jurisdiction over cross-appeal of order requiring one defendant to arbitrate in conjunction with appeal of order denying another defendant's motion for arbitration).

Pendent jurisdiction is appropriate because "[i]t would . . . be a manifest waste of the time and resources of parties, courts, and arbitrators were [the Court] to entertain only [the Noble parties'] appeal here, and leave consideration of the [Trust's] appeal to some unspecified future date. That is, if arbitration is improper in this case, everyone is served if that determination is made now." *Ross v. American Express Co.*, 547 F.3d 137, 142 (2d Cir. 2008). The issues are "so closely intertwined" that the "taking of pendent appellate jurisdiction over [the cross-appeal] is necessary to ensure meaningful review of the [Bankruptcy] Court's order in its entirety." *Palcko*, 377 F.3d at 595.

## III. STATEMENT OF ISSUES AND APPLICABLE STANDARDS OF REVIEW

1.      Did the Bankruptcy Court clearly err in finding that the Master Separation Agreement between Noble and Paragon does not provide for arbitration of the Trust's claims against the individual appellants, who are not parties to the Separation Agreement and are expressly excluded from the provisions on which they rely?

<u>Standard of review</u>. The appellants assert that "[a] court's conclusion as to whether non-signatories can enforce an arbitration clause is reviewed *de novo*." Br. at 3. The case cited by

the appellants, however, states only that a "legal conclusion" respecting an arbitration agreement is reviewed *de novo*. *In re Kaiser Group Intern., Inc.*, 307 B.R. 449, 454 (D. Del. 2004). "Whether or not a dispute is arbitrable depends upon the intent of the parties regarding arbitration. The proper standard of review has to be whether the district court's findings – interpretation of the contract, that is, the intent of the parties as to the meaning of the contract's language – are clearly erroneous. Thus, we address the issue of arbitrability under a clearly erroneous standard of review." *Lukens Steel Co. v. United Steelworkers of America*, 989 F.2d 668, 672 (3d Cir. 1993) (quotations omitted).

2.   Alternatively, did the Bankruptcy Court clearly err in concluding that the Plan does not supersede the arbitration provision even though it provides for the Bankruptcy Court to "retain exclusive jurisdiction" to "adjudicate the Noble Claims to the fullest extent permitted by law?"

Standard of review. The Bankruptcy Court's construction of the Plan is reviewed for clear error. *See In re Shenango Grp.*, 501 F.3d 338, 346 (3d Cir. 2007).

3.   Did the Bankruptcy Court abuse its discretion in denying a stay of the Trust's fraudulent transfer claims pending arbitration, where those claims predominate the ancillary damage claims for which the appellants sought arbitration, arbitration would not moot the claims to be tried by the Bankruptcy Court, and a stay would not alleviate the alleged discovery burden on the appellants?

Standard of review. The Bankruptcy Court's refusal to stay the fraudulent conveyance claims is reviewed for an abuse of discretion. Br. at 3.

4.   On cross-appeal: Did the Bankruptcy Court err in concluding that an arbitrator must decide whether the Trust's unjust enrichment claim is subject to arbitration, where the

Separation Agreement does not expressly or exclusively delegate the question of arbitrability to the arbitrator and the unjust enrichment claim does not depend upon and or intertwine with the Separation Agreement?

Standard of review.  As with issue 1, this is a mixed question.  The Bankruptcy Court's finding that "the Arbitration Provision contains 'clear and express' evidence that questions of arbitrability are to be decided by an arbitrator when it comes to the signatory parties," Op. at 37, is reviewed for clear error.  The Court's legal conclusion that the Trust's unjust enrichment claim "could plausibly fall within the bounds" of the Agreement, *id.* at 38, is reviewed *de novo*. *Century Indem. Co. v. Certain Underwriters at Lloyd's London*, 584 F.3d 513, 521 (3d Cir. 2009) ("Our review of a district court's order compelling arbitration, an order presenting legal questions concerning an arbitration agreement's existence and scope, is plenary").

## IV.     STATEMENT OF THE CASE

### A.      Noble Loots Paragon[3]

#### 1.      The Prelude:  Noble Searches For Ways To Dump Failing Assets

In the offshore drilling industry, rigs are classified into one of two categories.  "Standard spec" rigs are more than fifteen years old and unable to service deepwater wells or perform complicated operations.  "High spec" rigs are newer and capable of operating in deep water, handling heavier loads, and performing multiple operations simultaneously.  Compl. ¶ 34.

Historically, Noble operated both types of rigs, with standard spec rigs comprising a majority of its fleet.  By the early 2010s, however, Noble was at a crossroads.  The average age of its fleet approached thirty years, but customers increasingly demanded newer and more

---

[3]     The following summary provides factual context helpful for the Court's consideration of the appeal but is not comprehensive.  The Trust's Complaint [Adv. D.I. 1 ("Compl.")] includes a more detailed description of the facts giving rise to the Trust's claims.

efficient high spec rigs, in part due to safety concerns resulting from the 2010 explosion of the Deepwater Horizon rig in the Macondo field of the Gulf of Mexico and in part due to demand for projects requiring deep water drilling. *Id.* ¶¶ 35-36.[4]

Noble concluded that, "[i]n a post-Macondo world and given the proliferation of newbuild assets, customers and investors will continue to prefer contractors with the newest/highest capability assets." Noble noted that "our customers . . . have a strong preference for newer assets [and] [t]he older units will continue to be a disincentive for investors to choose Noble over peers because they assign a greater value to new assets." Noble determined that it was "time to fundamentally reshape Noble" and thus embarked on a "transformation strategy [that] involves divesting units that have limited future use." *Id.* ¶¶ 37-38.[5]

Noble first tried to sell its standard spec rigs, but failed to find any buyer that could obtain financing. *Id.* ¶ 39. Likewise, Noble's efforts to spin-off the old rigs through an IPO failed to generate sufficient interest in the market. *Id.* ¶¶ 44-48. Desperate to unload the old rigs before the market for the assets deteriorated any further, Noble hastily hatched a plan to transfer its old rigs to a group of newly formed subsidiaries (Paragon) and "spin" the equity to Noble shareholders. *Id.* ¶¶ 40-43. This structure had the benefit of giving Noble total control and enabling it to avoid an arms'-length market transaction that would test the real value of the aging assets.

---

[4] Noble's fleet was hardly "one of the most modern, versatile, and technically advanced fleets in the offshore drilling industry," as Noble now claims. Br. at 6. Noble's citation for that claim is its own press release touting the state of its fleet after it foisted the old standard spec rigs onto Paragon via the spin-off. *Id.* (citing Adv. D.I. 39-1, Ex. L).

[5] Noble now claims that it wanted to "unlock the value of these [old] assets," Br. at 7, but the document it cites says nothing of the sort. It reveals that "Noble's strategy [was] to focus on the ultra-deep water market and high specification jack-up market," for which the standard spec rigs were worthless. Bk. D.I. 716 ¶ 13.

2.      The Motive:  The Standard Spec Business Deteriorates

Noble's efforts to jettison the standard spec rigs became particularly urgent in 2013, as its customers began to signal their intentions to replace the aging assets in the coming years.

Petróleo Brasileiro S.A., commonly known as Petrobras, was, by revenue, the largest customer for Noble's standard spec business, representing more than 40% of the contract backlog (future revenue under contract) of what would become Paragon.  In July 2013, Petrobras announced that it planned to replace imported rigs (including the Noble rigs) with Brazilian-built rigs.  Petrobras also stated that it was shifting its focus to "pre-salt" drilling (deeper wells into oil fields below salt deposits), which required rigs with capabilities beyond that of the Noble standard spec fleet.  Petrobras also notified Noble that the contracts for two large standard spec drillships would expire more than a year earlier than Noble had forecast, slashing the value of its putative backlog and further signaling that Petrobras had no intention of extending the contracts on those ships.  *Id.* ¶¶ 49-55.

Meanwhile, another primary customer for the Paragon rigs, Petroleos Mexicanos, commonly known as "Pemex," announced in September 2013 that it no longer would enter into contracts for rigs older than fifteen years.  This would disqualify the entire Paragon fleet from contract renewals, or "rollovers."  At the time, Pemex represented more than 15% of the standard spec contract backlog and an even higher percentage of its forecasted cash flow.  *Id.* ¶¶ 56-59.

Separate and apart from these challenges, Noble had also "cold stacked" two standard spec rigs and a floating production and storage vessel (FPSO) in the Gulf of Mexico – a sign that Noble never expected them to find work again.  All three assets became part of the Paragon fleet in the spin-off but were never deployed.  *Id.* ¶¶ 60-61.

3.    The Method:  Noble Deceives The Market And Houlihan

Noble had to hide the true state of the standard spec business in order to convince lenders to put up the $1.7 billion Noble forced Paragon to pay for the standard spec assets.  Noble, for example, told lenders that Paragon had "well-established relationships with many of its customers, including . . . Petrobras [and] Pemex," and promised that Paragon would "[l]everage strategic relationships with [those] high-quality, long-term customers."  Noble cited Paragon's contract backlog with Petrobras and Pemex as a source of "[v]isibility, [s]tability and [f]lexibility" and repeatedly pointed to Paragon's "[s]trong [t]rack [r]ecord of [r]e-[c]ontracting" with its existing customers, including Petrobras and Pemex, as a major driver of stability and future success.  Noble said nothing about (a) Petrobras' indication that it would largely cease employing Noble's standard spec rigs or (b) Pemex's declaration that it would not renew contracts for rigs older than fifteen years.  Instead, it assured lenders that it expected both Petrobras and Pemex to "roll over" (renew) their contracts.  *Id.* ¶¶ 66-72.

Noble also misled lenders about the remaining life of Paragon's standard spec rigs.  It told lenders to "[e]xpect at least 10-15 years of useful life remaining in all rigs in [Paragon's] fleet" and said that the rigs "easily" could last "beyond a useful life of thirty to thirty-five years." Noble knew that was not true.  Noble's internal "Master Model" – which it has represented to be the source of all of its financial forecasts and modeling – projected that nearly 63% of the Paragon rigs (27 of 43) would be retired and out of service by 2021 (seven years after the spin-off), with virtually the entire fleet (39 of 42) retired by 2025.  *Id.* ¶¶ 73-76, 99 (Figure 2).

Finally, and critically, Noble misled Houlihan Lokey Financial Advisors, the firm it hired to provide a "solvency opinion" for the transaction.  Noble continues to tout Houlihan's opinion as evidence of Paragon's solvency, Br. at 8, but it fails to disclose that the solvency opinion was

9

driven entirely by management's false financial projections. Houlihan made no independent evaluation of Paragon's value or the projections. Compl. ¶¶ 88-92.

Noble's deception of Houlihan began with an omission. Instead of providing Houlihan with its entire Master Model – a forecast that ran from 2014 beyond 2030 – Noble stripped out the first five years of projections and gave them to Houlihan without any of the context of the Master Model. In doing so, Noble led Houlihan to believe that Paragon would continue as a stable going concern. Unbeknownst to Houlihan, however, the Master Model projected that Paragon would wither to next to nothing in the foreseeable future. While the customized forecast provided to Houlihan showed healthy revenues for all five years (through 2018), the rest of the Master Model – the part kept from Houlihan – predicted dramatically lower revenue starting in 2020 and thereafter, dropping to virtually nothing by 2031. *Id.* ¶¶ 93-98 (Figure 1).

Even the limited five-year projections provided to Houlihan were false. The projections assumed that every existing rig contract would be renewed at maturity despite the fact that 80% of Paragon's contracts (34 of 43) were due to expire by 2015, just one year into the projection period. The projections also assumed that each contract would be renewed at similar or higher dayrates than the existing contract rate, despite the glut of superior "newbuild" competition coming into the market and that Noble knew would drive down dayrates. As shown above, Noble knew that Petrobras was trying to terminate several contracts early (and, at a minimum, would not be renewing those contracts) and that Pemex had declared that it no longer would contract for rigs older than fifteen years (and, at a minimum, was at risk of not renewing its existing contracts). *Id.* ¶¶ 100-02.

Incredibly, the forecast Noble gave Houlihan even provided for the three rigs that had been cold stacked to begin working in 2015 and 2016, with each generating revenue during the

five-year projection period, despite the fact that Noble and market analysts never expected them to work again.  In 2016 alone, those three vessels accounted for $196 million of the projected revenue for Paragon (10% of the total revenue projection) and $99 million of the projected EBITDA for Paragon (12% of the total EBITDA projection).  *Id*. ¶ 103.

### 4.    The Deed:  Noble Absconds With $1.7 Billion

Having been misled by Noble, lenders ultimately provided $1.7 billion in financing to Paragon on July 18, 2018, the proceeds of which Noble immediately transferred to itself.  Two weeks later, Noble transferred Paragon's equity to Noble shareholders and Paragon was an independent entity, left to fend for itself.  *Id.* ¶ 108-10.

### 5.    The Aftermath:  Bankruptcy

Paragon shares began trading on August 4, 2014, at $11.21 per share.[6]  The shares dropped 9% in their first trading day and, as Noble's deceptions were revealed to the market, plummeted straight down.  The shares had fallen by 82% within six months and were trading for pennies in less than a year.  *Id.* ¶¶ 115-29.

On November 10, 2014 – just three months after the spin-off – Paragon reported third quarter earnings and announced that it had taken a $929 million impairment charge related to its three drillships in Brazil and the FPSO.  The impairment charge was required by Paragon's assessment of the dim prospect for future business for the assets, specifically the likelihood that Petrobras would not renew its agreements.  *Id.* ¶ 120.

---

[6]    Noble touts this as "the best evidence" of Paragon's solvency.  Br. at 8.  But the market price immediately after the spin-off was premised on Noble's false statements about Paragon.  The better evidence is what happened as the facts were revealed to the market:  plummeting stock and debt prices followed by bankruptcy.

In accord with its pre-spin announcement, Pemex terminated or let lapse three Paragon rig contracts in November and December 2014, followed by six additional contracts in the first nine months of 2015. By the end of 2015, Pemex had gone from being one of Paragon's largest customers to employing a single working rig.[7] *Id.* ¶¶ 124-25.

Predictably, Paragon's business fell far short of the forecast Noble provided to Houlihan and even the downside "sensitivity" case that Houlihan applied to that forecast. The following chart compares Paragon's actual results with the Noble forecast:

**Comparison Of Projections To Actual Results (in millions)**

|  | **2015** | **2016** |
|---|---|---|
| Revenues (Management Projection) | 2,043 | 2,032 |
| Revenues (Houlihan Sensitivity) | 1,710 | 1,469 |
| Revenues (Actual) | *1,369* | *575* |
| EBITDA (Management Projection) | 910 | 837 |
| EBITDA (Houlihan Sensitivity) | 644 | 429 |
| EBITDA (Actual) | *562* | *181* |
| EBIT (Management Projection) | 528 | 432 |
| EBIT (Houlihan Sensitivity) | 273 | 61 |
| EBIT (Actual) | *222* | *(39)* |
| Net Income (Management Projection) | 319 | 249 |
| Net Income (Houlihan Sensitivity) | 75 | (90) |
| Net Income (Actual) | *(1,000)* | *(338)* |

*Id.* ¶ 127 (Figure 4).

Insolvent and undercapitalized, Paragon ultimately could not service the massive debt Noble had heaped upon it and filed for bankruptcy on February 14, 2016.

---

[7]  Noble claims that Paragon failed due to "unforeseen market pressures," particularly the "game-changer" announcement in November 2014 that OPEC would not cut petroleum production. Br. at 11-12. By that time, however, Paragon *already* had taken its $929 million write-off due to the predictable lack of future Petrobras business (obviously unrelated to a drop in oil prices). Similarly, oil prices had nothing do with Pemex's decision not to renew its contracts given Pemex's new-rig contracting policy (adopted when oil prices were higher) or with the lack of work for the cold stacked rigs given Noble's inability to contract them in times of higher oil prices.

### B.    The Timeline:  All Relevant Conduct Occurred Before The Master Separation Agreement

Noble laid the organizational foundation for the spin-off in April 2013, when it formed "Paragon International Finance Corporation," followed by four more Paragon entities by the end of the year.  Adv. D.I. 79, Exs. 4-6.  In December 2013, Noble installed appellant James MacLennan, Noble's Chief Financial Officer, as Paragon's sole director.  Compl. ¶ 30.  Noble spent the next seven months putting the pieces in place and, by the middle of July 2014, all of the misconduct that damaged Paragon had occurred:

- <u>June 11, 2014</u>:  The Paragon Board (appellant MacLennan) approved Paragon's bank financing.

- <u>June 30, 2014</u>:  The Paragon Board (appellant MacLennan) approved the "spin-off plan" and Paragon bond offerings.

- <u>July 11, 2014</u>:  A Noble "Transaction Committee" (appellants Edwards, Hall, and Williams) approved bond and bank loan pricing.

- <u>July 11, 2014</u>:  The Noble Board (appellants Cawley, Edwards, Hall, Marshall, Ricciardello, and Williams) provided "general approval of Separation and Spin-Off," and delegated powers to its Transaction Committee to finalize the deal.

- <u>July 15, 2014</u>:  The Paragon Board (appellant MacLennan) authorized implementation of the spin-off.

- <u>July 15, 2014</u>:  Noble transferred all "standard spec assets" to Paragon and caused Paragon to execute two share purchase agreements and three intercompany promissory notes by which a Paragon subsidiary (Paragon Finance) "agreed" to pay a "purchase price" totaling $1,710,550,000.

- <u>July 18, 2014</u>:  The Paragon bank and bond financing closed, and Paragon used the loan proceeds to pay off the intercompany notes, transferring $1,710,736,022.32 (a sum including three days of interest) to Noble affiliates.

Adv. D.I. 39-1, Exs. A, C-G; Compl. ¶¶ 21-23, 109.

*Two weeks later*, immediately before Noble distributed Paragon shares to Noble shareholders and thereby created two independent entities, Noble addressed the administrative details associated with the cleavage of the two businesses that had been operated as one.  On July

31, 2014, Noble and Paragon executed the Separation Agreement and the other "Ancillary Agreements" on which the appellants now rely.[8]

Those agreements are between Noble and Paragon. None of the individual appellants are parties to them. They are not called the "Spin-Off Agreements" as the appellants now label them. Br. at 2. They are defined as the Master Separation Agreement and the "Ancillary Agreements." MSA § 2.5. That term is apt. Collectively, the Separation Agreement and Ancillary Agreements "set forth the principal arrangements between them regarding the separation of the Paragon Business from the Noble Business and the Distribution" of Noble-owned shares in newly independent Paragon to Noble shareholders. *Id.* Recitals. For its part, the Separation Agreement includes provisions related to continuing intellectual property licenses (§ 2.2); recording the transfer of assets (§ 2.3); bank and brokerage accounts (§ 2.7); indemnification obligations (§§ 3.3-3.12); distributing Noble-owned Paragon shares to Noble shareholders (§§ 4.1-4.3); accessing corporate records and maintaining legal privileges (§§ 6.3-6.6); insurance policies (§ 6.11); and cooperation in FCPA and other litigation matters (§§ 6.12-6.13).[9]

Critically, *neither the Separation Agreement nor any Ancillary Agreement mention or include any provision respecting what Paragon would pay Noble for the transferred assets*. That is because Noble *already* had dictated and finalized those terms in the share purchase agreements and intercompany promissory notes, and Paragon *already* had transferred $1.7 billion to Noble, two weeks before the Separation Agreement was executed. This is undisputed.

---

[8]  The Separation Agreement, or "MSA," is in the record at Adv. D.I. 25-1. The Ancillary Agreements are in the record at Adv. D.I. 25-2 through 25-5.

[9]  The Trust's brief below summarized the matters covered by the Ancillary Agreements. Adv. D.I. 38. at 7.

Unlike the share purchase agreements and intercompany promissory notes, the Separation Agreement has an arbitration clause.  MSA § 5.1.  But it is not accurate to claim, as the appellants insist, that "Paragon agreed to arbitrate all claims – whether based in contract, tort or any other theory – arising out of and/or related to the Spin-Off."  Br. at 2.  That language – "arising out of and/or related to the Spin-Off" – does not exist in the Separation Agreement.  As demonstrated below, the appellants' characterization exaggerates the scope of the arbitration provision, which does not extend to the Trust's claims.  Those claims have nothing to do with the rights and obligations created by the Separation Agreement or the Ancillary Agreements.  Indeed, despite multiple opportunities, the appellants have failed to draw any connection between the rights and obligations created in these agreements and the Trust's claims.[10]

### C.     The Bankruptcy Case And Ruling Below

At the time of bankruptcy, Paragon was in a liquidity crisis, fearing that it would be required to post cash-backed bonds for massive contingent tax liabilities that Noble had concealed from both Paragon and its lenders.  Compl. ¶¶ 121-23.  Taking advantage of Paragon's dire straits, immediately prior to bankruptcy Noble leveraged a proposed settlement with Paragon that would have released Noble (and the other appellants) from all liability associated

---

[10]  Moreover, Paragon never "agreed" to anything.  At all times until Paragon shares were distributed to Noble shareholders on July 31, 2014, "Paragon" was merely a collection of assets and entities formed, wholly owned, and controlled by Noble.  Paragon had no independent directors, officers or professionals, and Noble refused to allocate Paragon the funds with which to retain them.  Paragon had no say in the price Paragon would pay Noble for the transferred assets, the amount that Paragon would borrow to finance that payment, the Noble liabilities that Paragon would assume, or any other substantive matter.  Compl. ¶¶ 81-87; Adv. D.I. 88 at 4-9.  Thus, as the Bankruptcy Court noted, "the Trust sufficiently alleges that Noble 'absolutely and completely dominated Paragon at all times through execution of the MSA,' the other Agreements, and the Arbitration Provision.  Indeed, even the Defendants suggest the elements of procedural unconscionability have likely been met in this case."  Op. at 35-36 (footnotes omitted).

with the spin-off in exchange for assistance with Paragon's potential bonding obligations.  Bk. D.I. 399-4.  Paragon conducted no discovery prior to agreeing to the settlement, which the Bankruptcy Court rejected in the course of denying confirmation of Paragon's first proposed plan of reorganization.

Stakeholders returned to the negotiating table and ultimately agreed upon the Plan, which the Court confirmed by the Confirmation Order entered on June 7, 2017.  Bk. D.I. 1614.  Rather than settle Paragon's rights against Noble, the Plan preserved them.  The Plan provided for Paragon to transfer to the Trust all "Noble Claims," including the causes of action alleged in the Complaint.  At the same time the Plan was modified to preserve the Noble Claims, language was added to the section providing for the Bankruptcy Court's continuing jurisdiction to specifically provide that the Bankruptcy Court would have "exclusive jurisdiction . . . to adjudicate the Noble Claims to the fullest extent permissible under law."  Plan §§ 5.7, 11.1(r); Confirmation Order ¶¶ OO, 45.  Although Noble insisted on changes to the Plan and Confirmation Order, none of the appellants commented on or objected to the Bankruptcy Court's retention of exclusive jurisdiction over the Noble Claims.

The Trust filed its Complaint on December 15, 2017.  It first asserted five causes of action for avoidance of $1.7 billion in fraudulent transfers Paragon made to Noble (Counts I-V, referred to as the "fraudulent transfer claims") and then three damage claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and unjust enrichment (Counts VI-VIII, referred to as the "damage claims").  At no time until the middle of February 2018 did Noble or the other appellants assert that any of the Noble Claims were subject to arbitration or that the Plan's exclusive jurisdiction provision was invalid.

On February 15, 2018, however, the appellants filed a motion to dismiss the three damage claims in favor of arbitration and to stay the five fraudulent transfer claims pending arbitration. Adv. D.I. 23. The appellants admitted that the fraudulent transfer claims were not subject to arbitration and would be litigated in the Bankruptcy Court. *See Lipscomb v. Clairvest Equity Partners L.P. (In re LMI Legacy Holdings, Inc.)*, 553 B.R. 235, 246-47 (Bankr. D. Del. 2016) ("The Third Circuit has found that fraudulent transfer claims under 11 U.S.C. § 544(b) and § 548 are creatures of the Bankruptcy Code, . . . [and] therefore, the Debtor's pre-petition agreements would not bind these claims.") (citing *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1155 (3d Cir. 1989)).

The Bankruptcy Court denied the motion as to the two counts against the individual appellants, concluding that the individuals cannot enforce a contract to which they are not parties, stating: "there is no room for the interpretation that the Paragon and Noble Directors can compel the signatory, Paragon, to arbitration." Op. at 31. "In fact," the court continued, "there is clear evidence that the parties expressly *ruled out* arbitrating" disputes with the non-signatories. *Id.* (emphasis in original).

As to the remaining unjust enrichment claim against Noble and its corporate affiliates, the Bankruptcy Court did *not* "compel[] arbitration," as the appellants claim. Br. at 5. Instead, the Bankruptcy Court held that the corporate appellants – as express beneficiaries of the Separation Agreement – may ask an arbitrator to determine whether that claim is subject to arbitration. Op. at 27 ("any questions of arbitrability relating to these parties should be left to the arbitrator to decide"). Moreover, the Bankruptcy Court did *not* – as the appellants claim – "conclude[] that . . . language in the Arbitration Provision was sufficiently broad so as to include the claim for unjust enrichment." Br. at 16 (citing Op. at 38). Rather, the Bankruptcy Court found, upon a

cursory review, that a "plausible" connection between the Trust's claims and the arbitration provision served to put the arbitrability of the unjust enrichment claim before the arbitrator. Op. at 38.

Finally, the Court declined to stay the five fraudulent transfer claims. It found that "the very heart of the Complaint stems from the fraudulent conveyance" claims, that those claims are not contingent on success of the unjust enrichment claim, and that there is "no reason to delay litigation of the majority of the claims pending the resolution of one associated claim, particularly given the more limited collateral estoppel problems established by the results of arbitration." *Id.* at 43.

## V.    SUMMARY OF ARGUMENT

1.    The Bankruptcy Court did not clearly err in finding that the individual appellants may not enforce the arbitration provision of the Separation Agreement. The Separation Agreement does not provide for arbitration of claims against the individual appellants. To the contrary, it expressly excludes them from benefits of the agreement. Moreover, the Trust's claims – which are not dependent upon the Separation Agreement and would exist even if the agreement had never been executed – are not within the scope of the agreement's arbitration provision. Independently, the specific language of Plan's exclusive jurisdiction provision – providing that the Bankruptcy Court shall have exclusive jurisdiction to "adjudicate the Noble Claims to the fullest extent permitted by law" – supersedes the arbitration provision.

2.    The Bankruptcy Court also did not abuse its discretion in declining to stay the Trust's fraudulent conveyance claims pending arbitration of the unjust enrichment claim. The fraudulent conveyance claims predominate the ancillary damage claims for which the appellants sought arbitration and, even if all three of the ancillary claims were sent to arbitration, the arbitration would not moot or limit the fraudulent transfer litigation before the Bankruptcy Court.

18

The appellants suffer no prejudice in the absence of a stay because they are subject to discovery on the fraudulent transfer claims in any event.

3. The Bankruptcy Court, however, did err in concluding that an arbitrator should decide whether the Trust's unjust enrichment claim is subject to arbitration. The Separation Agreement does not expressly or exclusively delegate the question of arbitrability to the arbitrator. Even if it did, that delegation is limited to issues relating to interpretation or construction of the Separation Agreement. And because the unjust enrichment claim has nothing to do with the rights and obligations created by the Separation Agreement, there is no connection between the claim and the agreement that would justify having an arbitrator make the arbitrability determination.

## VI. ARGUMENT

### A. The Bankruptcy Court Did Not Clearly Err In Finding That The Individual Appellants May Not Enforce The Arbitration Provision

The Bankruptcy Court's denial of the arbitration request made by the individual appellants is correct for four independent reasons. First, the Separation Agreement does not provide for arbitration of claims against the individual appellants. Second, the individual appellants are not otherwise entitled to enforce the rights of the parties to the Separation Agreement. Third, the Trust's claims are not within the scope of the Separation Agreement's arbitration provision (and there is no presumption that the claims against the non-signatory defendants are arbitrable). Fourth, the Plan's exclusive jurisdiction provision supersedes the arbitration provision. The Bankruptcy Court relied on the first ground for rejecting the individual appellants' motion, but any of the four grounds is sufficient for affirmance. *See, e.g.*, *Carlyle Inv. Management LLC v. Moonmouth Co.*, 779 F.3d 214, 221 n.5 (3d Cir. 2015) ("We may affirm a district court for any reason supported by the record.") (quotation omitted).

1. <u>Paragon Never Agreed To Arbitrate With Non-Signatories</u>

Under governing New York law,[11] a court must find "evidence which affirmatively establishes that the parties expressly agreed to arbitrate their disputes" before ordering arbitration. *Waldron v. Goddess*, 461 N.E.2d 273, 275 (N.Y. 1984). "[A]n agreement to arbitrate must be 'clear, explicit, and unequivocal' and may not be made through 'implication or subtlety.'" Op. at 28 (quoting *Waldron*, 461 N.E.2d at 275). The appellants agree that this is the standard, calling it an "unremarkable proposition." Br. at 19.

The Separation Agreement is the only evidence offered by the appellants regarding an intent to arbitrate. It is a contract nominally between Noble Corporation and Paragon Offshore plc (although, as noted above, Noble in fact dictated its terms and Paragon had no say in them).[12] MSA at 1. Those two entities are defined as the "Parties" to the agreement. *Id.*

The arbitration provision of the Separation Agreement applies to "[e]ach Party . . . and each member of its respective Group." *Id.* § 5.1. The "Noble Group" and "Paragon Group" are defined as the respective corporate subsidiaries and affiliates of each. *Id.* § 1.1 (definition of "Noble Group" and "Paragon Group"). "[D]irectors and officers of the Noble Group" and "directors and officers of the Paragon Group" are included within the Groups *solely* for "purposes of Section 6.12" of the MSA. *Id.* Section 6.12 relates to claims under the Foreign Corrupt Practices Act and has nothing to do with arbitration or the Trust's claims in this case. *Id.* § 6.12.

---

[11]  *See* Op. at 20-23; MSA § 7.2.

[12]  Given Noble's complete control over the drafting of the Separation Agreement, and captive Paragon's lack of the ability to bargain, any ambiguity or uncertainty in the Separation Agreement must be construed against Noble. *See, e.g.*, *Judd Burstein, P.C. v. Long*, 180 F. Supp. 3d 308, 312 (S.D.N.Y. 2016) ("Where a contract is ambiguous, New York follows the well-established *contra proferentem* principle which requires that equivocal contract provisions are generally to be construed against the drafter.") (quotation omitted).

Furthermore, section 7.7 of the Separation Agreement makes clear that "[t]his Agreement is solely for the benefit of the Parties and their respective Groups and is not intended to confer upon any other Person except the Parties and their respective Groups any rights or remedies hereunder." *Id.* § 7.7. As a consequence, the express language of the Separation Agreement dictates that directors and officers of Noble and Paragon have no "rights or remedies" under the Separation Agreement except with respect to provisions relating to the FCPA.

The Bankruptcy Court found that this language was not "evidence which affirmatively establishes that the parties expressly agreed to arbitrate their disputes." Op. at 31. To the contrary, the inclusion of directors and officers within the definition of the Groups for the sole purpose of the FCPA provision "is clear evidence that the parties expressly *ruled out* arbitrating" disputes with the non-signatories. *Id.* (emphasis in original). The court further reasoned:

> The directors and officers of the Noble and Paragon Groups, including the Noble and Paragon Directors, are *expressly* excluded from being party to the Arbitration Provision. Applying the traditional contractual review tool of *expressio unius*, the Court finds that the Noble and Paragon Directors were specifically excluded from the MSA except as to Section 6.12. Section 6.12 does not tie, in any way, to the Arbitration Provision in § 5 of the MSA. Furthermore, the Arbitration Provision does not vest clearly a "right to invoke arbitration in a non-party . . ." which is required by *BNP Paribas*.

Op. at 32-33 (emphasis in original) (quoting *The Republic of Iraq v. BNP Paribas USA*, 472 Fed. Appx. 11, 13 (2d Cir. 2012).

The appellants argue that there is no language in the Separation Agreement "that expressly excludes Noble's or Paragon's officers and directors," claiming that the definitions of "Noble Group" and "Paragon Group" "do not explicitly exclude the officers and directors from the Arbitration Provision" but "merely provide that Section 6.12 . . . explicitly *includes* the officers and directors." Br. at 22 (emphasis added). But, as the Bankruptcy Court correctly

observed, *expressio unius est exclusio alterius* – the expression of one is to the exclusion of others – is a "standard canon of contract construction" under New York law. *National Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 254 (2d Cir. 2018) (quoting *Croteau v. A.C. & S. (In re N.Y. City Asbestos Litig.)*, 838 N.Y.S.2d 76 (N.Y. 1st Dep't 2007)). "Adopting any other reading would contravene the intent of the parties." *Id.*

Indeed, the appellants make no effort to explain why the contracting parties would have culled out Section 6.12 – but not any of other provision of the Separation Agreement – as applying to directors and officers if the parties actually had intended that *all* of the provisions of the Separation Agreement would apply to the directors and officers. In particular, why not also cull out Section 5.1 (the arbitration provision) which, like Section 6.12, imposes on each Party obligations in favor of the other's "Group"? The appellants do not say.

Lacking any credible answer to that question, the appellants instead seek solace in the Employee Matters Agreement (one of the Ancillary Agreements), noting that it incorporates the Separation Agreement's arbitration provision. Br. at 22-23. They contend that "[i]t would make no sense for the [Ancillary] Agreement that governed treatment of the Individual Appellants to incorporate by reference an arbitration provision they could not enforce and that could not be enforced against them." *Id.* at 23.

This novel assertion, not raised below, is specious. Like the Separation Agreement, the Employee Matters Agreement, is an agreement *between Noble and Paragon*. It serves "to allocate among them the assets, liabilities and responsibilities with respect to certain employee compensation, benefit plans and programs, and other employment matters." Adv. D.I. 25-3 at 1. The individual appellants are not signatories nor parties to that agreement and have no right to enforce its rights and obligations. Indeed, the Employee Matters Agreement specifically

forecloses that possibility: "Nothing in this Agreement, express or implied, *is intended to or shall confer upon any other person, including any Noble Employee, Paragon Employee or Transferred Employee, any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement*." *Id.* § 10.3 (emphasis added). Moreover, like the Separation Agreement, the Employee Matters Agreement specifies that there are "no employee third party beneficiaries" and that "no provision of this Agreement shall be construed to create any right, or accelerate entitlement, to any compensation or benefit whatsoever on the part of any Paragon Employee or Noble Employee or former employee." *Id.* § 9.3. The Employee Matters Agreement provides no evidence, much less "clear, explicit, and unequivocal" evidence, of any intent to include the individual appellants within the arbitration provision.

Finally, the Separation Agreement contains one additional clear indication that the non-signatory individuals were never intended to enforce the arbitration provision. Section 5.2(a) establishes an "escalation" protocol whereby parties eligible for arbitration first must attempt to resolve their disputes consensually. The protocol requires the delivery of an "Escalation Notice" "to the General Counsel, or if one does not exist, the President or Chief Executive Officer, of each party involved in the Dispute." MSA § 5.2(a). Because individuals obviously do not have officers like those named in the provision, this protocol provides further evidence that only corporate and related entities are able to invoke the arbitration provision.

2. The Individual Appellants Cannot Enforce Rights Of The Parties To The Separation Agreement

The appellants argue that, despite being expressly excluded from the arbitration provision, the individual appellants are entitled to enforce it by virtue of their status as officers and directors of the corporate parties to the Separation Agreement. Br. at 19-21. As the Bankruptcy Court correctly reasoned, however, the express exclusion of the appellants from the

23

arbitration provision – discussed immediately above – signals an intention that the non-signatory individual appellants should *not* be permitted to force Paragon to arbitrate any claims against them. Op. at 31-32.

Moreover, each of the three cases the appellants cite for the proposition that they can enforce the arbitration provision are distinguishable. Each involved claims against principals of a closely-held entity for *actions taken in furtherance of the agreement containing an arbitration provision*. In *Degraw*, for example, the action was for breach of a construction contract. *Degraw Constr. Grp. v. McGowan Builders, Inc.*, 152 A.D.3d 567 (N.Y. App. Div. 2017). The court held that individual defendants could enforce arbitration because "any breach of the agreement would necessarily have to occur as a result of some action or inaction attributable to an officer or employee of" the corporate defendant. *Id.* at 570. "[A] rule allowing corporate officers and employees to enforce arbitration agreements entered into by their corporation 'is necessary not only to prevent circumvention of arbitration agreements but also to effectuate the intent of the signatory parties to protect individuals acting on behalf of the principal *in furtherance of the agreement*.'" *Id.* (quoting *Hirschfeld Prods. v. Mirvish*, 88 N.Y.2d 1054, 1056 (N.Y. 1996)) (emphasis added).

*Hirschfeld* involved breach of a joint venture agreement with Mirvish Productions (MP) to produce a play. *Hirschfeld*, 88 N.Y.2d at 1056. The claims were subject to the agreement's arbitration clause because "Plaintiff's complaint is directed to misconduct related to MP's failure to effectively produce and promote the play, not to defendants' roles as owners of [the entity at which the play was run]." *Id.* And *Highland* similarly involved claims for breach of an architecture agreement where the individual defendants were sued in their capacity as "agents of

the professional corporation" that was a party to the agreement. *Highland HC, LLC v. Scott*, 978 N.Y.S.2d 302, 307 (N.Y. App. Div. 2014).

The Trust's claims, in contrast, are not for actions taken by the individual appellants in furtherance of the Separation Agreement. As shown immediately below, *the Trust's claims have nothing to do with the Separation Agreement and would exist even if Noble never had forced Paragon to sign it. Cf. Choctaw Generation L.P. v. American Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001) (under estoppel theory, signatory may be estopped from denying arbitration where "the claims that the nonsignatory sought to arbitrate were 'intimately founded in and intertwined with the underlying contract obligations'") (quoting *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995)); *Smith/Enron Cogeneration L.P. v. Smith Cogeneration Int'l*, 198 F.3d 88, 98 (2d Cir. 1999) (same).[13]

Accordingly, because the non-signatory individual appellants were excluded from the Separation Agreement's arbitration clause and the Trust's claim do not concern actions taken in furtherance of that agreement, the appellants' authorities are inapposite.

---

[13]  The Bankruptcy Court found "no reason to believe that New York state courts would apply equitable estoppel to the issue at hand." Op. at 29. The appellants do not challenge that conclusion on appeal. In any event, there is no basis for estoppel here because the Trust is not "trying to have [its] cake and eat it too," by relying on the Separation Agreement as the basis for its claims but then "repudiat[ing] it when it works to its disadvantage." *Lapina v. Men Women N.Y. Model Mgmt.*, 86 F. Supp. 3d 277, 284 (S.D.N.Y. 2015); *Ishimaru v. Fung*, No. Civ. A 929, 2005 WL 2899680, at *18 (Del. Ch. Oct. 26, 2005) ("One of the primary justifications for estopping a signatory from denying a non-signatory a right to arbitrate is that it is unfair for the signatory to have it both ways by attributing to a non-signatory the duties of a contract signatory for purposes of pressing claims but denying the non-signatory the right to invoke the arbitration clause") (citations omitted).

3. The Trust's Claims Are Not Within The Scope Of The Arbitration Provision

In any event, the claims asserted by the Trust do not fall within the scope of arbitrable disputes under the Separation Agreement. As an initial matter, the appellants misstate the Bankruptcy Court's (and this Court's) role in determining the arbitrability of the Trust's claims against the individual appellants. The appellants assert that "'there is little doubt that a connection could *plausibly exist* between the claim[s] and the broad language of the Arbitration provision.'" Br. at 21 (quoting Op. at 38) (emphasis added). That language from the Bankruptcy Court's opinion concerns its evaluation of the unjust enrichment claim against the corporate defendants, signatories to the Separation Agreement.

New York courts have rejected this kind of "plausibility" test when non-signatories seek to enforce an arbitration provision. *See Gerszberg v. Li & Fung (Trading) Ltd.*, 215 F. Supp. 3d 282, 288 (S.D.N.Y. 2016) (rejecting non-signatory's argument that "any 'non-frivolous' or 'colorable' claim of [third-party beneficiary] status is sufficient to pull a signatory into arbitration to resolve that issue of arbitrability") (citation omitted). The court instead "underscore[d] the judicial duty, at the threshold to determine whether a non-signatory to an agreement is *in fact* a third-party beneficiary entitled to compel a signatory to arbitrate claims thereunder." *Id.* at 289-90. Likewise, the Second Circuit has made clear that "a court must *first determine* whether the parties have a sufficient relationship to each other *and to the rights created under the agreement.*" *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 209 (2d Cir. 2005) (emphasis added). A more firmly established relationship is thus required.

The appellants also incorrectly invoke the general presumption in favor of arbitration. Br. at 17. They neglect, however, the fact that "[t]he presumption in favor of arbitration does not extend . . . to non-signatories to an agreement; it applies only when both parties have consented

26

to and are bound by the arbitration clause." *Griswold v. Coventry First LLC*, 762 F.3d 264, 271 (3d Cir. 2014).

The appellants' efforts to lower the bar on the issue of relational sufficiency is no doubt fueled by how little of substance they can say on the matter. The appellants assert that "the Trust's claims against the Individual Appellants arise out of and relate to the Spin-Off." Br. at 16. The appellants, however, define "Spin-Off" in a circular and misleading way. *Id.* at 4 ("Spin-Off" is defined as "Noble's spin-off of Paragon in August 2014"). The only thing that happened in August 2014 was the distribution of Paragon shares to Noble shareholders, resulting in the formal cleavage of the two businesses. That distribution of shares and separation of businesses is the subject of the Separation Agreement that Noble forced Paragon to sign on the date of the distribution.

The Trust's claims against the individual appellants, on the other hand, relate to their actions that led to Paragon's incurrence of $1.7 billion debt and transfer of the proceeds to Noble on July 18, 2014, two weeks *before* the distribution of shares and separation of businesses and two weeks *before* the Separation Agreement. The Trust's claims have nothing to do with the Separation Agreement, much less the construction, interpretation, enforcement, validity, or breach of the Separation Agreement. And they do not arise out of or relate to "the transactions contemplated" by or the "actions taken in furtherance of the transactions contemplated by" the Separation Agreement. MSA § 5.1.

The Separation Agreement provided a mechanism for distribution of the Paragon shares (Article IV) and addressed the post-closing activity between Noble and Paragon that would effectuate the technical separation of Paragon business from Noble business. This activity included the provision of administrative services, transfer of employees, payment of taxes, and

various other matters having no relationship to the Trust's claims. In contrast, the Trust's claims relate to the share purchase agreements, intercompany promissory notes, and payments made weeks before, about which the Separation Agreement says nothing. As the appellants acknowledge, "[a]ll of the Trust's claims center on the value Paragon received . . . ; whether Paragon was insolvent . . . ; and whether the Individual Defendants acted in good faith . . . ." Br. at 24.[14] Those issues do not concern or intertwine with the Separation Agreement. *All of the actions that determined what Paragon paid to acquire the assets and that otherwise bear on the Trust's claims – such as arranging financing to be delivered to Noble – occurred independently from, and were completed well before execution of, the Separation Agreement.* The damage to Paragon had been done weeks before the Separation Agreement was ever executed.[15]

The appellants' own summary of the factual allegations that support the Trust's fiduciary duty claims (Br. at 25) demonstrates this. All of the allegations identified – providing false statements to prospective lenders, Houlihan and others about Paragon's future business; concealing Noble's "Master Model" from Houlihan; and failing to provide Paragon with independent counsel – occurred well before and have no connection to the distribution and administrative matters addressed by the Separation Agreement. None of those allegations, nor any of the other allegations detailed over the course of thirty pages in the Complaint (see Compl. ¶¶ 1-3, 34-110), arise out of, touch on, or depend upon the Separation Agreement. Indeed, the

---

[14]   The ellipses remove references to "the Spin-Off" which, as noted above, the appellants have misleadingly defined.

[15]   Below – but not on appeal – the appellants argued that "absent the MSA, [the Paragon] rigs would not have been transferred, the Spin-Off would not have been effectuated, and the Trust's claims would not exist." Adv. D.I. 44 at 15. This was simply false. The rigs were transferred no later than July 15, 2018, weeks before the Separation Agreement. Adv. D.I. 39-1 at 5 (item 49). That is how Noble was able to entice lenders to loan Paragon $1.7 billion, something that would not have been possible if Paragon did not own the assets that the appellants said only were transferred later.

Complaint refers to the Separation Agreement only twice for unrelated reasons. Compl. ¶ 87 (citing Separation Agreement to demonstrate Noble's dominion over the transaction) and ¶ 111 (citing Separation Agreement's choice of law, currency and venue provisions for purpose of showing appellants' connections to the United States).

The appellants nevertheless try to shoehorn the Trust's claims into the Separation Agreement by arguing that the "[t]he Spin-Off was the 'transaction contemplated' by" the Separation Agreement. Br. at 9, 15-16. In support, the appellants cite the Agreement's "Recitals." *Id.* at 9. But those Recitals make no mention of a "spin-off." Indeed, the Separation Agreement never uses the term "spin-off" anywhere in its fifty-five pages. Instead, the Recitals recite precisely what the Separation Agreement does: "set forth the principal arrangements between [Paragon and Noble] regarding the separation of the Paragon Business from the Noble Business and the Distribution" of Paragon shares to Noble shareholders. MSA at 1.

On these facts, the Trust's claims do not fall within the scope of the Separation Agreement's arbitration provision. *See, e.g.*, *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 175-76 (3d Cir. 2014) (arbitration clause not operative where plaintiff's claim "does not require construction of, or even reference to, any provision of the" agreement providing for arbitration); *Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 155-57 (Del. 2002) (no arbitration of fiduciary duty claims that do not "touch on contract rights or contract performance" or "depend on the existence" of the underlying contract and "would be assertable had there been no" agreement); *Telecom Italia, SpA v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1116 (11th Cir. 2001) ("Disputes that are not related – with at least some directness – to performance of duties specified by the contract do not count as disputes 'arising out of' the contract, and are not covered by the standard arbitration clause."); *Ford v. NYLCare Health*

*Plans of Gulf Coast, Inc.*, 141 F.3d 243, 250-51 (5th Cir. 1998) (a claim is "arbitrable if it is so interwoven with the contract that it could not stand alone, but is not arbitrable if it is completely independent of the contract and could be maintained without reference to a contract").[16]

### 4. The Plan Precludes Arbitration

An alternative basis for affirmance is that the Plan supersedes the Separation Agreement's arbitration provision. Although the Bankruptcy Court rejected this argument, the Court may affirm on this ground because the Trust argued it below.

The Plan explicitly provides that the Bankruptcy Court "shall retain exclusive jurisdiction" to "adjudicate the Noble Claims to the fullest extent permitted by law." Plan § 11.1(r). This was not an accident. The creation and funding of the Trust, and vesting of the Noble Claims with the Trust, were fundamental components of the Plan. Plan § 5.7; Confirmation Order ¶¶ N(e), N(j), 33. Nor was the Court's retention of jurisdiction a surprise to the appellants given the Court's rejection of the proposed settlement and the creditors' subsequent decision to preserve claims against Noble for the Trust to pursue after confirmation. Yet, although Noble indisputably was aware of the provisions of the Plan and Confirmation Order, and indeed commented on drafts of them, it never objected or attempted to change the provisions that gave exclusive jurisdiction over the Noble Claims to the Bankruptcy Court.

Several cases demonstrate that, on these facts, the Plan supersedes the Separation Agreement. In *Ernst & Young*, the confirmed plan retained bankruptcy court jurisdiction for the

---

[16] The appellants' own authority is consistent. *Stechler v. Sidley, Austin Brown & Wood, L.L.P.*, 382 F. Supp. 2d 580, 591-92 (S.D.N.Y. 2005) (no arbitration of claims against non-signatory where the "claims can hardly be characterized as arising out of or being integrally related to the Agreements; nor do they make reference to or presume the existence of the Agreements. Were this Court to find the Agreement[s] void, invalid, or unenforceable, Plaintiffs would still have valid causes of action against the . . . Defendants.") (quotations, footnotes, and alterations omitted).

purpose of "adjudication of any pending adversary proceeding, or other controversy or dispute." *Ernst & Young LLP v. Baker O'Neal Holdings, Inc.*, 304 F.3d 753, 755 (7th Cir. 2002). The Seventh Circuit held that an arbitration provision in the debtor's contract with a defendant was "superseded by the terms of the confirmed plan." *Id.* at 756 ("the terms of this plan specifically called for the bankruptcy court to retain jurisdiction *to adjudicate* such disputes"). The Circuit reasoned that the defendant could have protected its right to arbitrate by objecting to the plan and requesting that it expressly assume the arbitration provision but failed to do so. *Id.*

Similarly, in *In re All American Semiconductor, Inc.*, No. 07-12963-BKC-LMI, 2010 WL 2854153 (Bankr. S.D. Fla. July 20, 2010), *aff'd,* No. 10-23406-CV, 2011 WL 3843943 (S.D. Fla. Aug. 29, 2011), a confirmed plan provided for the bankruptcy court to have exclusive jurisdiction over "all matters arising out of, arising in or related to, the Chapter 11 Cases to the full extent permitted by applicable law," including various "Litigation Claims" that could be brought by a liquidation trust to be formed pursuant to the plan. *Id.* at *4. The court held that the defendants' "failure to contest the venue and exclusive jurisdiction provisions . . . constitute[d] a waiver of those provisions," noting that they "had to know [they were] a potential target" of claims by the liquidation trust but failed "to object to confirmation and raise the issue of the exclusive jurisdiction and venue provisions" of the plan. *Id.* at *6-*9.

The facts are even more compelling here. In *Ernst & Young*, general language that the bankruptcy court would retain jurisdiction to adjudicate "any pending adversary proceeding" was sufficient to supersede arbitration rights. Paragon's Plan, on the other hand, includes not only that general language (Plan § 11.1(b)) but also a *specific* provision indicating that the Bankruptcy Court has "exclusive jurisdiction" to "adjudicate the Noble Claims" (Plan § 11.1(r)). Noble was aware of the Plan, knew that the appellants were "targets" of potential claims, and insisted on

edits preserving purported rights and defenses to those claims in exchange for its agreement not to object to confirmation, yet Noble said nothing about arbitration and did not object to the Bankruptcy Court's exclusive jurisdiction to adjudicate the Noble Claims.[17]

Despite this, the Bankruptcy Court concluded that the Plan's general reservation of Noble's "rights and defenses" trumped the Plan's exclusive jurisdiction provision. Op. at 19. But that elevates the general over the specific. *See, e.g.*, *In re G-I Holdings, Inc.*, 755 F.3d 195, 205 (3d Cir. 2014) ("In interpreting the entire agreement, specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.") (quotation omitted). It renders superfluous the specific act of amending the Plan to provide that the Bankruptcy Court would have exclusive jurisdiction "to adjudicate the Noble Claims to the fullest extent permitted by law," as the Bankruptcy Court already had jurisdiction over adversary proceedings and other matters. It also rewards gamesmanship, as Noble specifically culled out one defense in its requested Plan language ("offset claims under Section 502(h) of the Bankruptcy Code") but kept its alleged arbitration defense hidden for more than ten months after confirmation, well after the Trust or its creditor predecessors could address the issue in the Plan.

## B. The Bankruptcy Court Did Not Abuse Its Discretion In Denying A Stay Of Litigation

The appellants asked the Bankruptcy Court to stay the Trust's five non-arbitrable fraudulent transfer claims (Counts I-V) pending arbitration of the Trust's three damage claims

---

[17] The two reported cases cited by the appellants below are distinguishable as they involved plan language that preserved arbitration rights by adopting the arbitration contract or ensuring that claims would be adjudicated as if the bankruptcy case had not been commenced. *In re CIT Grp., Inc.*, No. 09-16565 (ALG), 2012 WL 831095, at *2 (Bankr. S.D.N.Y. Mar. 9, 2012) (plan treats claims as if case had not been filed); *In re GWI, Inc.*, 269 B.R. 114, 188 (Bankr. D. Del. 2001) (plan "specifically adopts" arbitration agreement).

(Counts VI-VIII). The Court declined to enter a stay, concluding that litigation should proceed in tandem with a potential arbitration of the one claim (unjust enrichment) it found potentially subject to arbitration. Op. at 39-44.

The appellants attack that decision, claiming that "[t]he bankruptcy court's legal error in denying arbitration of the claims against the Individual Appellants led directly to the Court's abuse of discretion in refusing to stay the litigable claims." Br. at 23. As shown above, there was no error – legal or otherwise – in denying arbitration of the claims against the individual appellants. But even if those claims are found to be subject to arbitration, the Bankruptcy Court clearly did not abuse its discretion in denying a stay. In arguing to the contrary, the appellants get both the law and facts wrong.

To start, the appellants assert a "general rule that litigable claims that substantially overlap with arbitrable claims should normally be stayed in favor of the arbitration." *Id.* at 25. That assertion is not accompanied by any citation to authority, because it is false. As the Bankruptcy Court noted, "Supreme Court law clearly stipulates that, normally, the FAA [Federal Arbitration Act] 'requires piecemeal resolution when necessary to give effect to an arbitration agreement.'" Op. at 41 (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 223 (1985)). The default rule is parallel litigation and arbitration.[18]

Federal courts, of course, have the discretionary power to stay proceedings pending arbitration. In considering a request for a stay, they consider "the predominance of the arbitrable claims, the merit of the non-arbitrable claims, the court's concern with controlling its own

---

[18] *See, e.g.*, *Pipia v. Rauscher Pierce Refsnes, Inc.*, 714 F. Supp. 501, 503 (D. Kan. 1989) ("The general rule is that arbitration and federal litigation should proceed simultaneously absent compelling reasons to stay the litigation.") (citing *Dean Witter*, 470 U.S. at 225 (White, J., concurring); *Chang v. Lin*, 824 F.2d 219, 223 (2d Cir. 1987); *Girard v. Drexel Burnham Lambert, Inc.*, 805 F.2d 607, 611 (5th Cir. 1986)).

docket, and overall judicial economy." *F.D. Imp. & Exp. Corp. v. M/V REEFER SUN*, 248 F.
Supp. 2d 240, 250-51 (S.D.N.Y. 2002) (citation omitted). Consideration of those factors here
make clear that the Bankruptcy Court did not abuse its discretion.

The relative importance of the claims is a critical factor. Where "[t]he heart of [a]
[d]ebtor's complaint concerns the avoidance of fraudulent transfers" and potentially arbitrable
claims are "peripheral," courts refuse a stay. *In re Gandy*, 299 F.3d 489, 497-98 (5th Cir. 2002);
*see, e.g.*, *In re S.W. Bach & Co.*, 425 B.R. 78, 99 (Bankr. S.D.N.Y. 2010) (staying arbitration of
ancillary claims pending adjudication of fraudulent transfer claim). There can be no dispute that
the fraudulent transfer claims predominate this action. They are the first five claims listed in the
Trust's Complaint and, without question, provide the greatest source of potential recoveries for
Paragon creditors – in essence, the return of all of the $1.7 billion the creditors loaned to
Paragon, plus interest.

Similarly, as this Court has held, a stay does not serve judicial economy where, as here,
(a) "the parties will still litigate" the entire case; (b) "the arbitration may resolve, at best, only [a]
portion of [the] claims"; and (c) the plaintiff would "lose its trial date." *Intellectual Ventures I
LLC v. AT&T Mobility LLC*, No. 13-1668-LPS, 2016 WL 6542857, at *2 (D. Del. Oct. 24,
2016). The Trust's fraudulent conveyance claims relate to transfers made more than four years
ago and have been pending since December 2016. The Bankruptcy Court's scheduling order
provides for a trial to occur no earlier than the end of 2019. Adv. D.I. 56. A stay likely would
push a trial to 2021 or beyond. *See In re Latimer*, 489 B.R. 844, 867 (Bankr. N.D. Ala. 2013) (a
stay pending arbitration "increase[s] the danger of prejudice resulting from the loss of evidence,
including the inability of witnesses to recall specific facts, or the possible death of a party").

A final consideration is the degree to which resolution of disputed issues of fact common to both arbitrable and non-arbitrable claims would benefit from court-supervised discovery and adversarial litigation in accordance with the applicable federal rules. In *American Shipping Line*, for example, the court refused to stay non-arbitrable claims pending arbitration of related contract claims despite "[t]he moving defendants offer to participate in discovery notwithstanding the stay" because the "offer [wa]s not an adequate substitute for court-ordered discovery pursuant to the Federal Rules of Civil Procedure." *American Shipping Line, Inc. v. Massan Shipping Industries, Inc*., 885 F. Supp. 499, 503 (S.D.N.Y. 1995). This point is particularly apt here because, as the appellants note (Br. at 27-28), the Separation Agreement limits discovery of all kinds. MSA § 5.6.

The appellants make two arguments as to why a stay should have been entered. First, they claim that "[t]he fact that the three [damage] claims arise from the same factual allegations is precisely why a litigation stay is appropriate." Br. at 26. As the Bankruptcy Court noted, factual overlap "does not suffice to require a stay." Op. at 42; *e.g.*, *Lepera v. ITT Corp*., No. 97-1461, 1997 WL 535165, at *8 (E.D. Pa. Aug, 12, 1997) ("the fact that arbitrable and nonarbitrable claims are factually intertwined is insufficient to require that the nonarbitrable claims be stayed") (citing *McMahon v. RMS Electronics, Inc.*, 618 F. Supp. 189, 192 (S.D.N.Y. 1985)).

The case cited by the appellants as "on all fours with this case" (Br. at 26) in fact bears no resemblance to it. In *EXDS, Inc. v. Ernst & Young LLP (In re EXDS, Inc.)*, 316 B.R. 817, 826 (Bankr. D. Del. 2004), the debtor asserted claims for negligence, negligent misrepresentation, breach of contract, breach of fiduciary duty, unjust enrichment, and fraudulent transfer arising out of E&Y's alleged failure to oversee bills submitted by an entity providing internet data

services to the debtor. After finding the first five claims subject to arbitration, the court stayed the lone tangential fraudulent transfer claim, "adopt[ing] the position taken by the court" in *In re Hagerstown Fiber Ltd. P'ship*, which had "similar facts." 277 B.R. 181, 208 (Bankr. S.D.N.Y. 2002). The claims in *Hagerstown* "[at] their core" were "contractual in nature," and the "fraudulent conveyance claims are directly connected to the contract disputes, and present alternative theories of disaffirmance." *Id*. In contrast, the fraudulent transfer claims in this case do not depend in any way on interpretation of the Separation Agreement or any other contract between the parties.

Next, the appellants argue that they will be prejudiced from having "to litigate the remaining claims under the bankruptcy court's far broader discovery rules than would be available to the Trust in arbitration." Br. at 27. This, however, is just a backdoor attack on the Bankruptcy Court's denial of the motion for arbitration of the damage claims against the individual appellants, as it assumes a "right to proceed first in arbitration" (Br. at 27) that the Bankruptcy Court found not to exist.

In any event, even if they had such a right, the individual appellants are not prejudiced in the absence of a stay. The individual appellants were core participants in the fraudulent conveyances. As a result, the Trust will take discovery from the individual appellants in respect of the fraudulent conveyance claims, as it will in respect of the damage claims. Any stay would only delay that inevitable discovery, not limit or eliminate it.

The Bankruptcy Court thus did not abuse its discretion in denying a stay of the Trust's fraudulent conveyance claims pending arbitration.

**C.    The Bankruptcy Court Erred In Holding That An Arbitrator Must Decide Whether The Unjust Enrichment Claim Is Subject To Arbitration**

Finally, while the remainder of its decision was correct and should be affirmed, the Bankruptcy Court erred in concluding that an arbitrator should decide whether the Trust's unjust enrichment claim is subject to arbitration. Op. at 23-27.

The Third Circuit has long recognized that courts "have a limited but important threshold role to play when a litigant moves to compel arbitration." *Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172, 178 (3d Cir. 2010). In determining whether arbitration should be compelled, the court considers "two threshold questions: (1) Did the parties seeking or resisting arbitration enter into a valid arbitration agreement? (2) Does the dispute between those parties fall with[in] the language of the arbitration agreement?" *CardioNet*, 751 F.3d at 172 (quotations omitted).

"In the vast majority of cases, the arbitrability of a dispute is a question for judicial determination." *Id.* at 171 (citations omitted). "[Q]uestions of arbitrability, including challenges to an arbitration agreement's validity, are presumed to be questions for judicial determination." *Quilloin v. Tenet HealthSystem Philadelphia, Inc.*, 673 F.3d 221, 228 (3d Cir. 2012) (citation omitted). "The burden of overcoming the presumption is onerous, as it requires express contractual language unambiguously delegating the question of arbitrability to the arbitrator." *Opalinski v. Robert Half Int'l. Inc.*, 761 F.3d 326, 335 (3d Cir. 2014) (citation omitted). The intention to delegate must be "clear and unmistakable." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

The Separation Agreement does not meet that standard. Nothing in the arbitration provision gives the arbitrator exclusive authority respecting arbitrability. Rather, the provision states that the arbitrator "shall have full power and authority to determine issues of arbitrability."

MSA § 5.6(b). This text does not specify that *only* an arbitrator may determine those issues; merely that an arbitrator has the power to do so.[19]

More importantly, the delegation provision does not extend beyond disputes involving the interpretation, construction, implementation, or breach of the Separation Agreement. The Defendants' selective quotation of Section 5.6(b) of the Separation Agreement (Br. at 10) omits critical language:

> The arbitrators shall have full power and authority to determine issues of arbitrability but shall otherwise be *limited to interpreting or construing the applicable provisions of this Agreement or any Ancillary Agreement* and will have *no authority or power to limit or expand, alter, amend, modify, revoke or suspend any condition of this Agreement or any Ancillary Agreement*; it being understood however, that the arbitrators will have full authority to implement the provisions of this Agreement or any Ancillary Agreement, and to fashion appropriate remedies for breaches of this Agreement (including interim or permanent injunctive relief). . . .

MSA § 5.6(b) (emphasis added). Thus, while Section 5.1 purports to mandate arbitration of a dispute that "arises out of or relates to" the Separation Agreement "or the transactions contemplated hereby or thereby," Section 5.6(b) limits the arbitrator's powers to "interpreting or construing" the Separation Agreement, "implement[ing] the provisions" of the Separation Agreement, and "fashion[ing] appropriate remedies for breaches" of the Separation Agreement.

Any delegation of the question of arbitrability in Section 5.6(b) of the Separation Agreement necessarily must be limited to matters on which the arbitrator is authorized to rule – "interpreting or construing the applicable provisions of this Agreement" and "fashion[ing]

---

[19] *See Richardson v. Coverall N. Am.*, Inc., C.A. No. 18-532 (MAS)(TJB), 2018 WL 4639225, at *4 (D.N.J. Sept. 27, 2018) (noting that "[a] 'cross-reference to a set of arbitration rules containing a provision that vests an arbitrator with the *authority* to determine his or her own jurisdiction does not automatically constitute clear and unmistakable evidence that the parties intended to arbitrate threshold questions of arbitrability—at least where those parties are unsophisticated") (quoting *Allstate Ins. Co. v. Toll Bros., Inc.*, 171 F. Supp. 3d 417, 429 (E.D. Pa. 2016)) (emphasis in original).

appropriate remedies for breaches of this Agreement." But, as explained above, none of the Trust's claims in this action involve interpretation, construction, or breach of the Separation Agreement. Indeed, the Trust's claims do not implicate the agreement at all.

The Separation Agreement's incorporation of AAA rules into the arbitration provision is not "clear and unmistakable evidence" that the parties agreed to arbitrate arbitrability. Br. at 9. The Third Circuit rejected the incorporation rule in the context of class arbitrations and expressed skepticism of the rule in any context. In *Chesapeake Appalachia, LLC v. Scout Petroleum*, 809 F.3d 746 (3d Cir. 2016), the court reiterated (fourteen times) the "onerous" standard necessary to overcome the presumption that a court decides questions of arbitrability, and doubted that incorporation of arbitration rules could be sufficient evidence of an intent to delegate. *See id.* at 754 (incorporation of rules is "far from the 'clear and unmistakable' allowance needed for the arbitrators to decide the question of class arbitrability") (citations omitted), *id.* at 761 ("[I]t is not enough . . . to establish that the AAA rules provide for the arbitrators to decide, *inter alia*, the question of class arbitrability, and that, in turn, these rules are incorporated by reference pursuant to state law.").

Even if the Court were inclined to accept the incorporation rule as a general matter in the context of bilateral contracts, applying it under the circumstance here would distort the requirement of a "clear and unmistakable" intent to delegate arbitrability beyond recognition. As the Bankruptcy Court observed, the incorporation rule does not apply to "unsophisticated parties." Op. at 25; *Richardson*, 2018 WL 4639225 at *4 (courts adopting the incorporation rule "have expressed doubt about their own decisions when it comes to unsophisticated parties") (citing cases). That is because it cannot be reasonably presumed that unsophisticated parties, including those not represented by counsel, would appreciate that reference to a set of arbitration

rules would serve by operation of case law to delegate the question of arbitrability. Here, there is no dispute that Noble controlled all aspects of the Separation Agreements and that Paragon was denied counsel. *See* Compl. ¶ 83 (noting Noble refused Paragon counsel); Op. at 35-36 (further noting that "even Defendants suggest the elements of procedural unconscionability have been met in this case"). To suggest that Paragon, acting without its own legal counsel, would appreciate that reference to a set of arbitration rules would serve to delegate arbitrability "would be to rake 'a good joke too far.'" *Richardson*, 2018 WL 4639225 at *4 (citing *Allstate*, 171 F. Supp.3d at 429); *see also Jones Lang Lasalle Americas Inc. v. Int'l Bhd. of Elec. Workers Local Union*, C.A. No. 16-190, 2017 WL 6417631, at *2-3 (D. Del. Dec. 15, 2017) (McHugh, J.) (finding no clear error in predecessor judge's decision to reject the incorporation rule in context of bilateral contracts).

Finally, and most fundamentally, even if there was an unambiguous delegation of the question of arbitrability to an arbitrator – the Bankruptcy Court was still required to determine that a rational relationship exists between the claims and the arbitration contract. *See, e.g.*, *Douglas v. Regions Bank*, 757 F.3d 460, 462-63 (5th Cir. 2014) (delegation provision did not bind plaintiff "to arbitrate gateway questions of arbitrability in *all* future disputes with the other party, no matter their origin," only those with a rational relationship between claim and arbitration contract) (emphasis in original); *Turi v. Main Street Adoption Services, LLP*, 633 F.3d 496, 511 (6th Cir. 2011) ("even where the parties expressly delegate to the arbitrator the authority to decide the arbitrability of the claims related to the parties' arbitration agreement, this delegation applies only to claims that are at least *arguably* covered by the agreement"); *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1371 (Fed. Cir. 2006) (same).

The Bankruptcy Court's assessment of the relationship between the Trust's unjust enrichment claim and the Separation Agreement was cursory. Op. at 38-39. The court did not identify, even at high level, how the unjust enrichment claim – which as Defendants admit "center[s] on the value Paragon received" (Br. at 24) – arises from, intertwines with, or otherwise depends upon any right or obligation created in Separation Agreement. Instead, the Bankruptcy Court merely cited a paragraph from Complaint (¶ 87) and stated that the "Complaint pleads sufficient facts to place certain financial and substantive contractual terms at issue." Op. at 38.[20] The court made no effort to connect the undescribed "certain financial and substantive contractual terms at issue" – which simply further evince Noble's dominion of the transaction – and what is at issue in the Trust's claims, including the unjust enrichment claim. The Bankruptcy Court effectively treated the mere mention of the Separation Agreement in the Complaint's two hundred paragraphs as itself sufficient to provide a "plausible" connection between the Trust's unjust enrichment claim and the Separation Agreement. *Id.* That was legal error.[21]

---

[20] The Court also cited a recent Third Circuit decision, *FBI Wind Down, Inc. v. Heritage Home Group, LLC (In re FBI Wind Down, Inc.)*, No. 17-2315, 2018 WL 3602932 (3d Cir. July 27, 2018), but that decision has no relevance to whether there is a plausible or rational connection between the claims pled and the arbitration contract. Instead, the decision merely held that the arbitration provision in that case could have been written more broadly to capture all issues of contract interpretation, rather than just issues relating to accounting issues. *Id.* at *2. If anything, the decision – which held that the plaintiff's claims were *not* covered by the arbitration provisions – demonstrates the need to carefully evaluate whether the litigation claims actually fell within the scope of even what appears to be a broad arbitration provision.

[21] *See, e.g.*, *Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 141 F.3d 243, 250-51 (5th Cir. 1998) ("The fact that the complaint specifically referred to, and related as a factual matter to, the contract containing the arbitration clause was irrelevant. The tort action did not depend, *as a legal matter*, on the contract and, therefore, was not 'related to' the contract within the meaning of the arbitration clause.") (citing cases).

As shown in Section IV.A.3, above, there is simply no relationship, connection, or correlation whatsoever between the Trust's unjust enrichment claim and any of the provisions Separation Agreement. As a consequence, the Bankruptcy Court erred in concluding that the arbitrator should determine whether that claim is subject to arbitration.

## VII.    CONCLUSION

The Bankruptcy Court did not clearly err in finding that the Trust's damage claims against the individual appellants are not subject to arbitration and it did not abuse its discretion in denying a stay of litigation pending arbitration of the Trust's unjust enrichment claims. Those aspects of the order should be affirmed. The Bankruptcy Court did err in concluding that an arbitrator should determine whether the unjust enrichment claim is subject to arbitration, and that aspect of the order should be reversed.

Dated:   October 10, 2018

Respectfully submitted,

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Michael S. Neiburg*
Pauline K. Morgan (No. 3650)
Joel A. Waite (No. 2925)
Jaime Luton Chapman (No. 4936)
Michael S. Neiburg (No. 5275)
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

- and -

JONES DAY
Bruce Bennett
James O. Johnston
555 South Flower Street, 50th Floor
Los Angeles, California 90071
Telephone:  (213) 489-3939
Facsimile:  (213) 243-2539

- and -

Gregory M. Shumaker
David S. Torborg
51 Louisiana Ave., N.W.
Washington, DC 20001
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

*Counsel to Paragon Litigation Trust,*
*Appellee and Cross-Appellant*

## <u>TYPE-VOLUME CERTIFICATION</u>

Pursuant to Rules 8015(a)(7)(C) and 8016(d)(3) of the Federal Rules of Bankruptcy Procedure, this brief complies with the type-volume limitations of Rule 8016(d)(2)(B) of the Federal Rules of Bankruptcy Procedure as follows:

(1)     Exclusive of the portions exempted by Rule 8016(d)(2)(D) of the Federal Rules of Bankruptcy Procedure, the brief contains 13,301 words, according to the count of Microsoft Word.

(2)     The brief was prepared using Microsoft Word in 12-point Times New Roman, a proportionally-spaced font.

October 10, 2018                                          _/s/ James O. Johnston_____
                                                                   James O. Johnston
                                                                   *Counsel to Paragon Litigation Trust,*
                                                                   *Appellee and Cross-Appellant*